FILED
2026 Sep-29 PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JOHN D. HARRIS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:24-cv-01735-AMM** |
| | ) | |
| **U.S. PIPE, A QUIKRETE COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

# MEMORANDUM OPINION

Plaintiff John D. Harris, Jr., brought this action against his former employer, United States Pipe and Foundry Company, LLC ("U.S. Pipe"), alleging that U.S. Pipe terminated his employment because of his race, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Doc. 1. This case is before the court on U.S. Pipe's motion for summary judgment. Doc. 20. For the reasons explained below, the motion is **GRANTED**.

## I. BACKGROUND

U.S. Pipe is a pipe manufacturer with a facility in Bessemer, Alabama. Doc. 22-4 ¶ 2. Mr. Harris, who is African American, began working at U.S. Pipe as a pipe

trucker on February 18, 2003, transporting pipe within the plant from one department to another. Doc. 22-1 at 25[1]; Doc. 1 ¶ 18.

In 2006, U.S. Pipe promoted Mr. Harris to a production supervisor role. Doc. 22-1 at 28. Mr. Harris remained a supervisor, but he rotated through several different departments before returning to a general production supervisor role in or around 2020. *Id.*at 28–33. As a supervisor, Mr. Harris was responsible for training his team on safety measures and for issuing discipline where safety policies were violated. *Id.* at 104–10.

Certain restricted areas of the Bessemer facility require an employee to perform a "Lock Out Tag Out" or "LOTO" before the employee may enter. Doc. 22-2 at 17. A LOTO involves cutting power to machinery and placing a lock or tag on the machine or control panel showing which employee is present in the restricted area. *Id.* at 17–18; Doc. 22-4 ¶¶ 4–5; Doc. 22-1 at 49–50. Where another employee is already present in a restricted area, employees are trained to double check that a LOTO has been properly performed and to place their lock in the appropriate place on the equipment. Doc. 22-1 at 22, 49–51, 57–58; Doc. 22-2 at 17.

OSHA allows some modifications to full lockout procedures for certain machines, but even then the energy source must be disabled. Doc. 22-3 at 18.

[1] Where the court cites a deposition, the page number is the deposition transcript page number. Otherwise the page number is the CM/ECF page number.

Following LOTO procedures is essential to employee safety. *See* Doc. 22-1 at 83–84. Mr. Harris's current employer, Wheatland Tube, also has a LOTO policy in place. *Id.* at 38–41.

U.S. Pipe trains its employees on how to properly perform a LOTO and when a LOTO is required. *Id.* at 22, 28–29, 51, 58. Mr. Harris received this training. *Id.* U.S. Pipe trains its supervisors, and supervisors are expected to train hourly employees on their team. Doc. 22-2 at 18–19. Equipment that must be locked out/tagged out is marked with signs. Doc. 22-1 at 58, 65.

Mr. Harris recalls an employee who committed a LOTO violation getting caught in the cement hopper and losing his leg. *Id.* at 83–84.

Mr. Harris is aware that multiple U.S. Pipe employees have been terminated for violating the LOTO procedures. *Id.* at 34–36.

In 2022, Quikrete acquired U.S. Pipe and, in 2023, placed added emphasis on safety protocols at the Bessemer plant. Doc. 22-3 at 13; Doc. 22-1 at 100–02.

Between December 2022 and January 2026, U.S. Pipe terminated four African American employees, four Caucasian employees, and one Hispanic employee for LOTO violations at the Bessemer plant:

a. Alex Serna (Engineer, Hispanic), Doc. 22-2 at 100;

b. Andrew Clements (Production Supervisor, Caucasian), Doc. 22-5 at 46; Doc. 22-2 at 101;

c. Herschel Higgins (Maintenance Technician, Caucasian), Doc. 22-2 at 101;

d. Michael Robertson (Leadperson, African American), *id.*;

e. Ron Sanders (Casting Technician, African American), *id.* at 102;

f. Ladarius Brown (Production Supervisor, African American), Doc. 22-1 at 112–13; Doc. 22-2 at 102;

g. Owen Eddin (Engineer, Caucasian), Doc. 22-1 at 113–14; Doc. 22-2 at 102;

h. Lane Castle (Millwright, Caucasian), Doc. 22-4 ¶ 9; and

i. Mr. Harris, Doc. 22-2 at 102.

Other individuals, including three African American employees, Dominic Rancher, Clarence Williams, and Brandon Ephraim, were terminated for LOTO violations, but were rehired upon the discovery of mitigating circumstances, such as improper training or improper practices engaged in by large groups of employees unbeknownst to upper management. *Id.* at 100–02; Doc. 22-4 ¶¶ 6–7.

U.S. Pipe has also investigated LOTO violations where, after discovering mitigating circumstances such as a lack of training or improper practices, it took no disciplinary action against the employees. Doc. 22-2 at 100–02. These employees included eleven African American employees and four Caucasian employees:

a. Earnest Wade (Melting Technician, African American);

b. Dewayne Gilbert (Melting Technician, African American);

c. Daryl Roseman (Melting Technician, African American);

d. Montez Sledge (Melting Technician, African American);

e. Marcus Miles (Melting Technician, African American);

f. La Questa Sims (Cold Side Technician, African American);

g. Ethan Desko (Maintenance Technician, Caucasian);

h. John Adams (Maintenance Technician, Caucasian);

i. Leonard Black (Maintenance Technician, African American);

j. Larry Salter (Maintenance Supervisor, Caucasian);

k. Christopher Buie (Production Technician, African American);

l. Jon McAvoy (Zinc Technician, Caucasian);

m. Christopher Jones (Water Handler & EO, African American);

n. Anthony Gamble (Cleaning Supervisor, African American); and

o. Julius Hubbard (Melting Technician, African American);

*Id.*

On March 7, 2023, Mr. Harris attended a meeting where, in response to a spike in injuries, upper management (including Carlos DaSilva) discussed U.S. Pipe's intention to improve its safety culture and the need to be more stringent with safety measures. Doc. 22-1 at 100–05.

On March 13, 2023, Mr. Harris heard a call over the radio that another employee, Michael Robertson (African American), needed help with a pipe on a crane in the pipe run. Doc. 22-1 at 116–17, 128–30, 168. Mr. Harris went to the

restricted area, discovered the gate already open, and moved into the area to help. *Id*. at 117–19. Mr. Harris testified that he panicked, did not lock out/tag out, and he did not check to see if another employee had already done so. *Id*. at 129–33. He admits that he entered the restricted area without placing his tag on the machine. *Id.* at 64, 66–67; *see* Doc. 26-1 ¶ 6.

Plant Manager Mike Lusco observed the surveillance footage of this incident. Doc. 22-3 at 26–27. He saw that someone was out on "the pipe run 90-degree turn" and did not see any evidence that Mr. Harris or Mr. Robertson followed the LOTO procedure. *Id*. at 28–29. Mr. Lusco, Mr. DaSilva, Mark Bria, Safety Manager Joe Cole, and Corporate Director Dana Gortney were involved in the decision to terminate Mr. Harris's and Mr. Robertson's employment following this incident. *Id.* at 25–26, 40–41, 105. They obtained statements from Mr. Harris and Mr. Robertson, followed a decisional flow chart, and determined that Mr. Harris and Mr. Robertson had committed LOTO violations that warranted termination. Doc. 22-1 at 168; Doc. 22-2 at 14, 37; Doc. 22-3 at 55–57.

In his statement regarding the incident, Mr. Harris noted that after the pipe was righted, the machine was restarted. Doc. 22-1 at 168. Mr. Robertson's statement states that he "made sure the stop[] button was down and went in and got it clear." Doc. 22-2 at 108. U.S. Pipe did not produce documents demonstrating that the

flowchart was used in the decision to terminate Mr. Harris's employment. *Id.* at 21–23.

To properly lock out the machine where this incident occurred, an employee must first stop the machine by pressing the stop button. Doc. 22-1 at 50–51, 132–33; Doc. 22-3 at 70–71. In his declaration, Mr. Harris testified that when he arrived at the scene, the power to the machine had already been cut and the machine was stopped. Doc. 26-1 ¶¶ 4, 6. He further explained that on this particular machine, he was not trained that LOTO procedures required anything other than to hit the emergency stop button. Doc. 22-1 at 130–33. But in his deposition, Mr. Harris testified that "[i]f you hit the emergency stop, you would expect the lock to be on there." *Id.* at 132–33.

Not all LOTO violations warrant termination. *See* Doc. 22-2 at 100–02; Doc. 22-4 ¶ 7. Where there is evidence of improper training or improper practices by large groups of employees unbeknownst to upper management, termination may not be appropriate. *See* Doc. 22-2 at 100–02; Doc. 22-4 ¶ 7. This is reflected on the flow chart. *See* Doc. 22-2 at 61, 128.

Mr. Bria, "HR," and Mr. Lusco informed Mr. Harris that his employment was terminated. Doc. 26-1 ¶ 8. They ended the call before answering Mr. Harris's questions. *Id.*

In 2020, Clarence Williams and Brandon Ephraim (both African American) had been involved in a LOTO incident where they crossed over the pipe run, the same piece of equipment where Mr. Harris's LOTO violation occurred, without locking out. Doc. 22-1 at 34; Doc. 22-4 ¶ 6. Mr. Williams and Mr. Ephraim were initially terminated. Doc. 22-3 at 30–33; Doc. 22-2 at 39–41, 82–83; Doc. 22-4 ¶¶ 7–8. An employee then told Mr. DaSilva that he did not believe their terminations "were right." Doc. 22-2 at 82–83. In response to this comment, U.S. Pipe reviewed the incident, and Mr. Williams and Mr. Ephraim were returned to work. Doc. 22-3 at 30–33; Doc. 22-2 at 39–41, 82–83; Doc. 22-4 ¶¶ 7–8. The review revealed that numerous employees in that area failed to lock out when they walked through the restricted area, and supervisors were allowing this practice. Doc. 22-4 ¶ 7. After this incident, the department was retrained on LOTO procedures for that machine. *Id.* ¶ 8.

In January 2023, Ron Sanders (African American) was terminated for stepping into a restricted area without locking out. Doc. 22-5 at 22–25; Doc. 22-6 at 12–17. David Miller (Caucasian) had thrown an airline that landed inside the restricted area, and Mr. Sanders went inside the barrier to retrieve it without following LOTO procedures. Doc. 22-5 at 21–24. Mr. Miller had reached into but did not step into the restricted area and was not terminated. Doc. 26-2 ¶ 6; Doc. 22-6 at 12–15.

In his declaration, Mr. Sanders testified that Robert Caffee and Jeremy McKinney (both Caucasian supervisors) were working nearby at the same time as his LOTO incident without following LOTO procedures. Doc. 26-2 ¶¶ 5–7. He also says that Robert Wandel (another Caucasian supervisor) observed Mr. Caffee and Mr. McKinney, and that none of these employees were terminated for a LOTO violation. *Id.* Mr. Lusco was aware of the allegations against these supervisors, but the senior management group watched the video of the incident and did not see LOTO violations by these employees. Doc. 22-3 at 80–81; Doc. 22-2 at 25–28.

About a month before Mr. Harris was terminated, Terry Cannon (Caucasian) worked on an oven while it was not locked out, and he was not terminated. Doc. 22-1 at 76–78. U.S. Pipe management were not aware of this incident, and Mr. Harris has not presented evidence that the process required LOTO procedures. Doc. 22-4 ¶ 3, n.1; Doc. 22-1 at 76–78.

In December 2023, Joe McAvoy (Caucasian), a zinc tech, crossed over the zinc machine, meaning he walked over a moving machine taking a shortcut, without locking out. Doc. 22-1 at 61–62, 79–81; Doc. 22-2 at 59–62, 132–36. Upon reviewing the incident, U.S. Pipe discovered that employees in the zinc department were frequently walking over the machine without locking out. Doc. 22-2 at 59–62. U.S. Pipe issued Mr. McAvoy a final warning/last chance agreement and retrained the department on the appropriate LOTO procedures. *Id.*

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether the movant has met this burden, courts must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). Courts "do not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSOUTH, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). "Summary judgment must be granted if the nonmoving party has 'failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294 (11th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III. ANALYSIS

Mr. Harris's complaint contains one count alleging that U.S. Pipe terminated his employment because of his race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Doc. 1 at 4–5; Doc. 22-1 at 63. A court considering a single motive Section 1981 race-discrimination claim employs the same analysis

as it would use under Title VII. *Melton v. I-10 Truck Ctr. Inc.*, 166 F.4th 905, 912 (11th Cir. 2026).

Where an "employee relies on circumstantial evidence to support his claim, '[courts] generally apply the *McDonnell Douglas*[[2]] burden-shifting framework.'" *Melton*, 166 F.4th at 913 (quoting *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022)). But "[a] plaintiff who cannot satisfy this framework may still be able to prove [his] case with what [courts] have sometimes called a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Tynes v. Florida. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1327–28 (11th Cir. 2011)).

U.S. Pipe argues that Mr. Harris cannot establish a prima facie case under *McDonnell Douglas* because he "cannot identify a proper comparator who was treated more favorably." Doc. 23 at 15. U.S. Pipe emphasizes that "[Mr. Harris] must demonstrate that [he] and [his] proffered comparators were similarly situated in all material respects such that they cannot reasonably be distinguished." *Id.* (cleaned up) (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1218, 1228 (11th Cir. 2019) (*Lewis I*)). It argues that it provided evidence supporting its legitimate, nondiscriminatory reason for terminating Mr. Harris's employment and that Mr.

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Harris cannot show that its reason was untrue or a pretext for discrimination. *Id*. at 16. Finally, U.S. Pipe argues that Mr. Harris cannot establish a convincing mosaic of race discrimination. *Id*. at 17–19.

Mr. Harris responds that he can easily establish his prima facie case because he can show that he was treated differently than similarly situated white employees and present other evidence of race discrimination. Doc. 27 at 15.

U.S. Pipe replies that Mr. Harris has not presented evidence of a "proper legal comparator" because the evidence regarding Mr. Harris's comparators does not show that they entered a restricted area or that U.S. Pipe was aware that they did so. Doc. 29 at 8–10.

**A. *McDonnell Douglas***

The *McDonnell Douglas* framework has three steps:

> 1. First, the plaintiff demonstrates a prima facie case, which may be done by showing: (i) the plaintiff is in a protected group; (ii) the plaintiff was well qualified; (iii) the plaintiff suffered an adverse employment action; and (iv) the plaintiff was treated less favorably than similarly situated employees outside of the plaintiff's protected group.
>
> 2. Second, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action.
>
> 3. Third, if the employer provides an adequate reason, the plaintiff has the opportunity to demonstrate that the employer's proffered rationale is pretextual.

*Ismael v. Roundtree*, 161 F.4th 752, 759 (11th Cir. 2025) (quoting *McDonnell Douglas*, 411 U.S. at 802–04).

### 1. Mr. Harris Has Failed to Establish a *Prima Facie* Case of Discrimination

U.S. Pipe challenges only whether Mr. Harris has established the comparator prong of his *prima facie* case. Doc. 23 at 15–16. "[T]he plaintiff must present evidence of a comparator—someone who is 'similarly situated in all material respects.'" *Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224). As the Eleventh Circuit has explained:

> Although what constitutes a 'material' similarity or difference will differ from case to case, ordinarily a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history.

*Id*. (citing *Lewis I*, 918 F.3d at 1227–28).

Mr. Harris was a long-term U.S. Pipe employee who had been a supervisor since 2006. Doc. 22-1 at 28–33. Mr. Harris had been trained on LOTO procedures, and he was responsible for training employees under his supervision on those procedures and issuing discipline where safety policies were violated. *Id.* at 104–10. A week before the incident that led to his termination, Mr. Harris had attended a meeting where Mr. DaSilva stressed safety and the need to be more stringent with safety measures. Doc. 22-1 at 100–05.

Mr. Harris admits the LOTO violation. *See, e.g.,* Doc. 22-1 at 129–33. Neither his statement nor Mr. Robertson's mentioned any alleged mitigating circumstances. *Id*. at 168; Doc. 22-3 at 77. U.S. Pipe's review of the video and investigation did not uncover mitigating circumstances. *See* Doc. 22-2 at 14, 37; Doc. 22-3 at 55–57.

In 2020, two African American employees, Mr. Williams and Mr. Ephraim, were involved in a LOTO violation involving the same piece of equipment where Mr. Harris's LOTO violation occurred. Doc. 22-1 at 34; Doc. 22-4 ¶ 6. Mr. Williams and Mr. Ephraim were initially terminated, but a review of the incident revealed mitigating circumstances, and they were returned to work. Doc. 22-4 ¶¶ 6–7. As a result of that incident, the department was retrained on LOTO procedures for the machine. Doc. 22-4 ¶ 8.

In December 2022, U.S. Pipe terminated the employment of Mr. Eddins, a Caucasian engineer, and in October 2023, it terminated the employment of Mr. Clements, a Caucasian production supervisor, both for LOTO violations. Doc. 22-2 at 102; Doc. 22-1 at 113–14. According to Mr. Harris, no one could believe it when Mr. Eddins was terminated because he had been there for "thirty, forty years." Doc. 22-1 at 113–14.

Instead of focusing on comparators in circumstances similar to his own LOTO violation, Mr. Harris focuses his comparator argument on the disparity between discipline imposed on Mr. Sanders, an African American employee, and on white

employees, Mr. Miller, Mr. Caffee, Mr. Wandel, and Mr. McAvoy, who were alleged to have also committed similar LOTO violations. Doc. 27 at 17–18. However, witness statements and surveillance videos establish that U.S. Pipe investigated the incidents involving these employees, and that only Mr. Sanders committed a LOTO violation. Doc. 22-2 at 73; Doc. 22-3 at 83, 85, 86; Doc. 28-1 at 2. That evidence showed that although Mr. Miller leaned over the restricted area to pass a hose to Mr. Harris, he did not enter the restricted area. Doc. 26-2 ¶ 6; Doc. 22-6 at 12–15.

The evidence about Mr. McAvoy's LOTO violation established mitigating circumstances, *i.e.*, that unbeknownst to U.S. Pipe, dozens of employees on the same machine failed to LOTO. Doc. 22-2 at 59–62. Mr. McAvoy was treated the same as Mr. Williams and Mr. Ephraim: his employment was not terminated and the department was retrained. *See id.* Further, Mr. McAvoy was not a supervisor and was in a different department from Mr. Harris. *See id.* at 101.

Mr. Harris's argument that "**if** Wandel, Caffee or Miller violated the policy then they should have been terminated," Doc. 27 at 19 (emphasis added), implicitly acknowledges the absence of evidence that these employees violated the LOTO policy. Indeed, Mr. Harris failed to present evidence showing that these employees violated the LOTO policy.

Because Mr. Harris has not presented evidence that he was treated less favorably than any similarly situated Caucasian employees, he has failed to establish a prima facie case of discrimination under the *McDonnell Douglas* framework.

**2. Defendant's Legitimate Nondiscriminatory Reason**

Because Mr. Harris has not established a prima facie case, under the *McDonnell Douglas* framework the burden does not shift to U.S. Pipe. Out of an abundance of caution, the court considers the undisputed evidence about U.S. Pipe's reasons for terminating Mr. Harris's employment.

U.S. Pipe terminated Mr. Harris's employment for violating U.S. Pipe's LOTO policy. Doc. 22-2 at 14.

Because this reason is a legitimate, non-discriminatory reason for U.S. Pipe's conduct, Mr. Harris "cannot prevail under the *McDonnell Douglas* framework unless he identifies substantial evidence that [U.S. Pipe's] proffered reasons were pretextual." *Melton*, 166 F.4th at 915. "To show pretext, a plaintiff must show '*both* that the [employer's] reason was false, *and* that discrimination was the real reason' for the adverse action." *Ismael*, 161 F.4th at 761 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Mr. Harris's pretext argument is that "the very same evidence which established the prima face case, including the comparator evidence, can be used to show pretext." Doc. 27 at 21.

Mr. Harris has presented no evidence either that U.S. Pipe's reason was false, nor that race was the real reason for his termination. Accordingly, Mr. Harris cannot establish a discrimination claim under the *McDonnell Douglas* framework.

**B. Convincing Mosaic**

"Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins*, 26 F.4th at 1250 (quoting *Smith*, 644 F.3d at 1328). A convincing mosaic may be established "by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id*. (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*)).

Mr. Harris argues that, even if his comparator evidence was insufficient to establish pretext, it is "still relevant to the ultimate question of intentional discrimination." Doc. 27 at 23 (citing *Lewis II*, 934 F.3d at 1187–88). None of Mr. Harris's comparator evidence consists of "information from which discriminatory intent may be inferred." *Jenkins*, 26 F.4th at 1250. U.S. Pipe reversed the terminations of two African American employees who committed LOTO violations on the very machine where Mr. Harris committed his infraction because, at that time,

there was evidence of mitigating circumstances. This occurred in 2020, three years before Mr. Harris's violation, and the department was retrained on the proper LOTO procedures. There is no dispute that U.S. Pipe fired both African American and Caucasian employees for LOTO violations without mitigating circumstances. Shortly before Mr. Harris's employment was terminated, in late 2022, Mr. Clements, a Caucasian production supervisor, was fired for a LOTO violation. Shortly after Mr. Harris's employment was terminated, U.S. Pipe fired Mr. Eddins, a Caucasian engineer, for a LOTO violation.

Mr. Harris points to Mr. McAvoy to establish a convincing mosaic of race discrimination. But there is no dispute that Mr. McAvoy was in a different department than Mr. Harris, was not a supervisor, and the investigation revealed evidence that employees in the zinc department were frequently walking over the machine without locking out. Doc. 22-2 at 59–62. Because of these mitigating circumstances, Mr. McAvoy was given a last chance agreement and his department was retrained. Mr. Harris's department had been retrained only three years earlier due to the LOTO violations involving Mr. Williams and Mr. Ephraim, whose terminations were reversed. Accordingly, this evidence about Mr. McAvoy does not support the inference of—let alone contribute to a convincing mosaic of evidence about—race-based discrimination.

The fact that there was a packet of information on Mr. McAvoy's LOTO investigation but not on Mr. Harris's has no impact on these undisputed material facts. And standing alone, the packet disparity cannot create a convincing mosaic of race-based discrimination. Mr. Harris and Mr. Robertson had both presented statements admitting their LOTO violation and failing to assert the existence of mitigating circumstances.

None of the record evidence is sufficient to establish a convincing mosaic that U.S. Pipe intentionally discriminated against Mr. Harris because of his race.

## IV. CONCLUSION

For the foregoing reasons, U.S. Pipe's motion for summary judgment is **GRANTED**. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 29th day of September, 2026.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE